# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
August 1, 2006 Session

## STATE OF TENNESSEE v. JIMMIE LEE HART

**Appeal from the Circuit Court for Lake County**
**No. 05-CR-8715     R. Lee Moore, Jr., Judge**

———

**No. W2005-02938-CCA-R3-CD  - Filed October 30, 2006**

———

The defendant, Jimmie Lee Hart, was convicted of possession of one-half gram or more of cocaine with the intent to sell or deliver, a Class B felony, and was sentenced to thirty years imprisonment as a career offender.  He appeals his conviction, contending (1) that the convicting evidence was insufficient and (2) that the trial court erred in refusing to instruct the jury on the meaning of the use of the Fifth Amendment right against self-incrimination.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which DAVID G. HAYES and ROBERT W. WEDEMEYER, JJ., joined.

James T. Powell, Union City, Tennessee, for the appellant, Jimmie Lee Hart.

Paul G. Summers, Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; C. Phillip Bivens, District Attorney General; and Karen Waddell Burns, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Police arrested the defendant as a result of an undercover drug buy operation involving a confidential informant that took place on January 14, 2005.  At the trial, the state presented evidence from the law enforcement officers involved in the undercover operation.  Lake County Sheriff's Investigator Jason Allison testified that he was involved in the investigation of the defendant on January 14, 2005, as were Lake County Sheriff's Chief Deputy Ronnie Moore and Tiptonville Police Investigator Joe England.  Investigator Allison stated that the officers used a confidential informant, Pete Perkins, to buy drugs from the defendant.  He said that a recording device called a "kell set" was placed on Perkins and that he instructed Perkins to talk as much as possible while with the defendant.  Investigator Allison gave Perkins $160 in marked $20 bills to be used during the sale.  He instructed Perkins that, during the transaction, he was to count the "buy money" and to keep the purchased drugs in his left hand.  Investigator Allison said his primary responsibility was to recover the drugs

from Perkins. He also gave Perkins a code phrase that Perkins was to say when the sale was completed: "Man, it's cold out here."

Investigator Allison testified that he and Investigator England followed Perkins, who was driving his own truck, in an unmarked police car. He said that the kell set was functioning and that he could hear Perkins in the truck. Perkins drove from Tiptonville to Ridgely, where he picked up the defendant. Investigator Allison said the defendant requested that Perkins drive to a nearby carwash because cameras were monitoring the location where Perkins picked him up. Investigators Allison and England followed the truck to the carwash. Investigator Allison said the longest period in which they lost sight of the truck was seven to ten seconds while the truck pulled into the carwash. He said no one else got into the truck besides the defendant and Perkins. The investigators parked their car across the street from the carwash while Perkins' truck was idle. Investigator Allen said that as the truck was leaving the carwash, he heard Perkins say the code phrase. Soon thereafter, Chief Deputy Moore, in his own vehicle, stopped Perkins' truck, and Investigator Allison heard the defendant say, "Oh, man, you know what you did." Investigator Allison said that after the stop, Perkins had in his left hand "eight rock-like white substance[s]" that "appeared to be crack cocaine." A pill bottle and eleven more rocks were found scattered on the floorboard of the truck. He said that the pill bottle was in the center of the floor and that the rocks were scattered along the driver's side. He said $990 in cash and two cellular telephones were also recovered from the defendant's person. The $160 buy money was found in the truck between the driver's and passenger's seats.

On cross-examination, Investigator Allison testified that he did not take fingerprints off either the plastic pill bottle or the buy money. He said about one minute elapsed between the time the truck pulled into the carwash and the time it was stopped. He said he gave Perkins $40 after the operation ended and did not know if Perkins was otherwise employed at the time. He said he could not see inside the truck while Perkins and the defendant were in it, although he could hear what was happening. He did not see any criminal activity taking place inside the truck, and neither the drugs nor the marked money were found on the defendant's person. He stated that it was Perkins who mentioned the defendant's name as a possible subject of an undercover investigation and that he had never used Perkins in any prior investigations. On re-direct examination, Investigator Allison stated that Perkins did not request payment for his services and that the decision to give him money was made after the operation ended.

Chief Deputy Ronnie Moore testified that he was involved in the undercover investigation on January 14, 2005. He said that he had known Pete Perkins, who had on many prior occasions given him accurate information that led to arrests, although January 14, 2005, was the first time he had used Perkins "with a body wire on a drug buy." Deputy Moore said he searched Perkins and his truck before the drug buy and did not find any drugs, money, or a pill bottle. He said he conducted a thorough search of Perkins by patting down his body on the outside of his clothes, unfastening his pants and belt buckle, shaking his waistband, and patting his feet without shoes.

Chief Deputy Moore testified that after the investigating team left their meeting place, he drove alone in an unmarked patrol car. He followed Perkins and Investigators Allison and England,

although he stayed out of sight. He said he used his cellular telephone to speak with Investigator Allison and could hear some of Perkins' conversation with the defendant that was being transmitted to Investigator England's car. He said he heard words that indicated "drug talk," such as "party tonight" and "these will work." Investigator Allison alerted him to when Perkins said the code phrase, and he drove to where Perkins' truck was stopped at a four-way intersection. He said he kept his focus on the defendant in the passenger's seat and saw the defendant make a motion with his arm. He ordered the defendant out of the truck and saw money in the middle of the front seat of the truck. Chief Deputy Moore said that he asked the defendant whose money it was and that the defendant responded, "My damn money. I worked for it." He said he also saw a pill bottle in the middle of the floorboard of the truck and crack cocaine rocks scattered along the floorboard of the driver's side. He said he searched the defendant and found $990 in cash, two cellular telephones, and a telephone calling card. He said that in his experience, it is common to find large amounts of money and cellular telephones on drug suspects.

On cross-examination, Chief Deputy Moore testified that he had never paid Perkins for any help he had given in the past. He said he did not search Perkins' underwear, and he admitted that drug users will hide drugs "wherever they can," including in their underwear. He said, however, that he believed any drugs hidden in a person's underwear would fall out if the person's pants were shaken "hard enough." Chief Deputy Moore said he searched under the seats on both sides of the extended cab truck. He said he also searched the glove compartment and looked in the opened ashtray. He said he felt underneath the dashboard of the truck and searched everywhere he could fit his hand, but not the vents because he "never found a vent [he] could stick [his] hand in." He said there may have been small "nicks or tears" in the seat of the truck but no holes large enough for a small bag of drugs. He acknowledged that many people who are not drug dealers carry cellular telephones and cash.

Investigator Joe England testified that he was a member of the West Tennessee Drug Task Force and that he had worked on about 300 drug cases. He said he worked on the case involving the defendant in which Pete Perkins was used as a confidential informant. He said that Perkins had provided the police with reliable and accurate information in past investigations. He said his main role in the investigation was to operate the electronics and to drive the unmarked patrol car while the kell set was running. He said the kell set operated like a one-way radio system and allowed them to hear and record sounds picked up by the transmitter, which was attached to Perkins. He said the kell set was working and was playing from the car that he drove with Investigator Allison. He said he and Investigator Allison followed Perkins to Ridgely, where Perkins picked up the defendant and drove to a carwash. He said that no one else was in the truck and that they lost sight of the truck for no more than a few seconds at a time. Investigator England said that Perkins and the defendant were in the "carwash area" for about one minute. He said the defendant did not say much while he was in the truck, though the defendant did tell Perkins to drive to the carwash in order to avoid surveillance cameras. Investigator England said the defendant also told Perkins, "You know what you done," after the truck was stopped.

On cross-examination, Investigator England testified that he had never used Perkins' services in an undercover operation. He said he could not see inside the truck from his car. He said that the drugs found in the car were on the driver's side of the floorboard, that the pill bottle was on the "hump" over the transmission in the middle of the floor, and that the money was in the middle of the seat. He admitted that no evidence showed that the defendant ever touched the money or the drugs and that it was possible that the drugs belonged to Perkins. Investigator England said he only knew what happened through Perkins.

Dana Parmenter, special agent forensic scientist with the Tennessee Bureau of Investigation (TBI) Crime Lab, was stipulated as an expert in the field of chemical analysis. She testified that the drugs recovered in this case were cocaine. She said the cocaine recovered directly from Perkins constituted 1.2 grams and the rocks found on the floor of the truck constituted 1.7 grams, for a total of 2.9 grams. She testified on cross-examination that she had no personal knowledge of the arrest or the origin of the drugs.

Ovid Leon "Pete" Perkins testified that he is a former user of cocaine and hydrocodone but that he was not using drugs on January 14, 2005. He said he agreed to work on an undercover drug case in Ridgely on that date after Chief Deputy Moore approached him for assistance. He said he agreed to help the officers because he had two young children who lived and played in the area where drugs were sold. He said he was not offered any money when he agreed to participate. He said officers were looking for one particular drug dealer whom he could not locate. He then informed the officers about the defendant, who Perkins said had offered to sell drugs to him. Before the drug sale, Perkins met with the officers, who searched him, placed an electronic wire on him, and told him to say, "It's cold out here," when the sale was complete.

Perkins testified that on January 14, 2005, he called the defendant and asked for the price on an "eight ball," or 3.5 grams, of crack cocaine. He said that he thereafter drove to the defendant's home and that the defendant requested they drive to a nearby carwash. He said the defendant wanted to go to the carwash because the parking lot of his apartment was monitored by cameras. He said that at the carwash, he handed $160 to the defendant, that the defendant pulled out a pill bottle from his pocket, and that the defendant removed eight crack cocaine rocks from the bottle. After this transaction was complete, Perkins said the code phrase and the police stopped him. He said the defendant said to him, "You knew this was going to happen, didn't you?"

The state then played the tape recording gathered from the kell set placed on Perkins. Much of the tape was inaudible due to loud background noise. The dominant voice on the tape, explained by Perkins to be his own voice, asked someone, explained by Perkins to be the defendant on the telephone, about a price. Perkins then spoke into the kell set and said that the defendant asked to be picked up. A car door was heard opening and a second voice, belonging to the defendant, was audible. The defendant made a comment about going to a carwash and about there being cameras. Later, Perkins could be heard counting to 160 by twenties. Some other conversation ensued, and Perkins said, "Man, it's cold out here." Soon thereafter, sounds of police sirens could be heard, and the defendant said, "Yeah, you know what you've done." Perkins was questioned by an officer, and

he told the officer that the defendant took a pill bottle out of his pocket and counted out eight $20 rocks, which he gave to Perkins and which Perkins kept in his left hand. Perkins said he was unaware of what the defendant did with the pill bottle after that.

On cross-examination, Perkins first testified that he was not paid for his help with the investigation. He later said that he was given $40 as reimbursement for fuel but that he did not profit from the event. He said he did not have a job at the time because he was recovering from alcohol and drug addictions. He again stated that he agreed to help with the investigation because he had young children and wanted to stop drug dealing in their neighborhood. He said he had stopped using drugs no sooner than a few months before the undercover investigation, although at another time he said it had been "a month or two" since he had last used drugs. He denied using drugs within a week of January 14, 2005. Perkins testified that he had never been paid by police before for helping or providing information to them. He did acknowledge that he had worked with the TBI on a few undercover drug buys and had received $100 in payment for each buy.

Regarding what was heard on the tape recording, Perkins testified that he was counting the money out to himself because he knew he could be heard on the wire. He acknowledged that he, not the defendant, could be heard talking about drugs on the tape. He said that when he and the defendant were talking about security cameras, they also talked about the danger of crime in the area. He said that it only took a few seconds for the defendant to count the crack cocaine rocks and hand them to him and that they were at the carwash for a total of about fifteen to twenty seconds. He said it could have been one minute that they were there. He said he did not know that the marked money and drugs were not found on the defendant. He said Chief Deputy Moore had thoroughly searched him before the buy but did not shake his underwear. He said that everything in his truck was searched, including the glove compartment and ashtray, and that there was no unsearched area of the truck where he could have hidden drugs. He said there were small holes or cracks in the vinyl of his seat that may have been big enough to fit a single crack rock, though none were large enough to fit a small bag of drugs.

On re-direct examination, Perkins testified that all the TBI undercover investigations with which he assisted resulted in convictions. He said Chief Deputy Moore had searched his waistband, his front crotch area, his hips, and his backside. He said he did not have any drugs on him before he purchased them from the defendant. He said he knew two individuals named Ginger Blackburn and Jesse Swift through his prior drug use. He said he had previously bought drugs from them.

The defendant called Jesse Swift, who testified that he knew Pete Perkins. When asked if he ever sold drugs to, bought drugs from, or used drugs with Perkins, Swift invoked his Fifth Amendment right against self-incrimination. Swift said that he was subpoenaed to testify at the trial and that he did not want to do so. The defense also called Ginger Blackburn to testify. Blackburn testified that she knew Pete Perkins but not personally. She refused to answer any other questions, invoking her Fifth Amendment right against self-incrimination.

After the conclusion of trial, the defendant was found guilty of possession of one-half gram or more of cocaine with the intent to sell. The trial court sentenced the defendant as a career offender to thirty years in the Department of Correction.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence was insufficient to support his conviction. He contends that the "weight of the evidence . . . was contrary to the jury's verdict." He argues that the state's case depended solely on the information provided by Pete Perkins, who was unreliable. The state argues that the defendant has waived this issue for failure to cite supporting authority. Alternatively, the state argues that the convicting evidence was sufficient and that it is not proper for this court to judge the weight and credibility of witness testimony.

Although general in nature, the defendant does cite authority in his argument on this issue. We will review this issue.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

The defendant was convicted of "knowingly, unlawfully and feloniously . . . possess[ing] with intent to sell or deliver a controlled substance, namely, Cocaine, in an amount over .5 gram[], a Schedule II controlled substance," in violation of Tennessee Code Annotated section 39-17-417. The state's evidence was sufficient to prove the elements of this crime. The state presented testimony of an eyewitness, Pete Perkins, that the defendant sold him eight crack cocaine rocks. These rocks were determined by analysis to equal 1.2 grams of cocaine. Another 1.7 grams of cocaine were found in the truck where the sale took place. Chief Deputy Moore testified that he thoroughly searched Perkins and his truck for drugs before the sale and found none. The testimony of the three officers was consistent on virtually every matter and corroborated much of Perkins' testimony. The defense attempted to question Perkins' credibility and sought to convince the jury that the drugs originated with Perkins. The jury was free to accept or reject this theory. Its verdict reflects that it chose to believe Perkins. The defendant misstates the law when he argues that we should overturn the trial court's judgment because the weight of the evidence is against the verdict. Even if this were true, our duty is to determine whether any rational juror could have found the defendant guilty beyond a reasonable doubt of the crime charged. We conclude that a juror could have done so and that the evidence was sufficient to convict the defendant.

## II. JURY INSTRUCTION ON THE FIFTH AMENDMENT

The defendant contends that the trial court erred in not instructing the jury as to the meaning of the witnesses' invocations of their Fifth Amendment rights against self-incrimination. At the trial, witnesses Swift and Blackburn invoked their Fifth Amendment rights and refused to answer questions about their involvement with Pete Perkins. At the conclusion of the defense's case, defense counsel asked the trial judge to instruct the jury "as to what the Fifth Amendment is, so they won't be confused." The judge refused to offer any instructions related to the Fifth Amendment. The defendant argues that this refusal prejudiced the defendant because the testimony of Swift and Blackburn was confusing to the jury and "[w]ithout certain understanding of what had occurred regarding the witnesses' plea of their Fifth Amendment protections against self-incrimination, the jury could not possibly have a complete picture of the case at hand." The state responds that the defendant has waived this issue, both for failure to cite appropriate authorities and for failure to make his request in writing. Alternatively, the state contends that any error regarding jury instructions was harmless.

We agree with the state that this issue should be waived for failure to cite appropriate authorities. The rules of this court state that issues not supported by citations to authorities will be waived. Tenn. Ct. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(7) ("The brief of the appellant shall contain . . . [a]n argument . . . with citations to the authorities and appropriate references to the record . . . ."). The defendant has provided us with no case or rule of law that supports his argument that the trial court erred in denying his request for instructions. This issue is waived.

## CONCLUSION

Based on the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE